IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

PAMELA VARNER,                                )
                                             )
                        Plaintiff,           )
                                             )          No. 2:23-cv-01834-DCN
            vs.                              )
                                             )          **ORDER**
TARGET CORPORATION                           )
                                             )
                        Defendant.           )
_____)

The following matter is before the court on defendant Target Corporation's

("Target") motion to exclude plaintiff Pamela Varner's ("Varner") experts, ECF No. 31,

and Target's motion for summary judgment, ECF No. 32.  For the reasons set forth

below, the court grants in part and denies in part Target's motion to exclude and denies

Target's motion for summary judgment.

## I.  BACKGROUND

Varner alleges that she tripped and fell over an empty endcap display at the end of

an aisle while shopping in a store that was owned and operated by Target (the "Store")

and that she was injured as a result.  ECF No. 1-1, Compl. ¶¶ 2, 5–6.  On February 13,

2023, Varner filed this lawsuit in the Charleston County Court of Common Pleas,

alleging a single cause of action for negligence.  See Compl.; Varner v. Target Corp.,

2023-CP-10-00713 (Charleston Cnty. Ct. C.P. Feb. 13, 2023).  Target removed the case

to this court on May 2, 2023.[1]  ECF No. 1.

---

[1] Target asserts that removal was timely pursuant to 28 U.S.C. § 1446(b) because
it did not learn this case was removable until it received Varner's answers to Target's
Request to Admit on valuation on April 5, 2023.  ECF No. 1 at 1.

On October 15, 2024, Target moved for the court to exclude two of Varner's expert witnesses, ECF No. 31, and for summary judgment, ECF No. 32. Varner responded in opposition to both motions on October 29, 2024. ECF Nos. 33; 34. Target replied to Varner's responses on November 5, 2024, ECF Nos. 35; 36. The court held a hearing on both motions on December 9, 2024. ECF No. 38. Because argument during the hearing focused on issues that were not featured prominently in the parties' initial briefing, the court invited the parties to supplement their filings. Id. As such, Target filed a supplemental memorandum in support of its motion to exclude on December 20, 2024. ECF No. 39. Varner responded to Target's supplement on January 3, 2025, ECF No. 41, to which Target replied on January 9, 2025, ECF No. 45. As such, both motions are now fully briefed and ripe for the court's review.

## II.  STANDARD

### A.  Motions to Exclude

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

District courts serve as gatekeepers for expert testimony. The court has a "special obligation" to ensure that expert testimony is relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993), the court's gatekeeping role requires that it address two questions: first, whether the expert's testimony is based on "scientific knowledge"; and second, whether the testimony "will assist the trier of fact to understand or determine a fact in issue." The first question is answered by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." Id. at 592–93. Several non-dispositive factors should be considered in determining the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community. See id. at 593–94. In considering these factors, the focus "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595. The factors are not exclusive; what factors are relevant to the analysis "depends upon the particular circumstances of the particular case at issue." Kumho Tire, 526 U.S. at 150. The second inquiry "goes primarily to relevance." Daubert, 509 U.S. at 591. Relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. Id. at 593; see also Sardis v. Overhead Door Corp., 10 F.4th 268, 281 (4th Cir. 2021) ("Simply put, if an opinion is not relevant to a fact at issue, Daubert requires that it be excluded.").

The proponent of expert testimony must demonstrate that the testimony satisfies these requirements. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) ("The proponent of the testimony must establish its admissibility by a preponderance of proof."). "[T]he trial court's role as a gatekeeper is not intended to serve as a

replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." United States v. Stanley, 533 F. App'x 325, 327 (4th Cir. 2013) (quoting Fed. R. Evid. 702 advisory committee's note). While Rule 702 was intended to liberalize the introduction of relevant expert evidence, courts "must recognize that[,] due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (quoting Daubert, 509 U.S. at 595).

### B. Motions for Summary Judgment

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, "'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment

will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp., 477 U.S. at 325. The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

Any reasonable inferences are to be drawn in favor of the nonmoving party. Anderson, 477 U.S. at 255, Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the fact finder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

### III.   DISCUSSION

The court will begin with consideration of Target's motion to exclude and then will proceed to Target's motion for summary judgment.

### A.  Motion to Exclude

Target seeks to exclude the testimony of two of Varner's experts: Mark Williams ("Williams") and Dr. Ellen Szubski ("Dr. Szubski").  ECF No. 31 at 1.  Varner presents Dr. Szubski as an expert in human factors, ECF No. 31-3 at 3, and Williams as an expert in architecture, ECF No. 31-5 at 1.  Target initially argues that both experts' testimony must be excluded because they relied on improperly obtained information when forming their respective opinions.  ECF No. 31 at 4–8.  Alternatively, Target advances various other arguments targeting the admissibility of each expert's testimony.  Id. at 8–15; ECF Nos. 36 at 3–5; 39; 45.  The court will start by examining Target's arguments regarding the improperly obtained information, will then consider Target's arguments specifically related to Dr. Szubski, and will conclude by analyzing Target's arguments directed at Williams.

### 1.  Improperly Obtained Evidence

In preparing their respective reports, both Dr. Szubski and Williams visited the Target Store in question and inspected the endcap where Varner allegedly fell.  See ECF Nos. 31-3 at 3; 31-5 at 2.  They both then used the measurements and photographs they took during these visits to craft their reports.  ECF Nos. 31-2, Szubski Depo. 38:13–41:23; 31-3 at 3; 31-4, Williams Depo. at 79:12–2; 31-5 at 2.  Target argues that this violated Rule 34 of the Federal Rules of Civil Procedure because neither Dr. Szubski nor

Williams asked permission before visiting the store and inspecting the endcap.  ECF No. 31 at 4–8.

Federal Rule of Civil Procedure 34 states:

(a) **In General.**  A party may serve on any other party a request within the scope of Rule 26(b):

. . . .

(2) to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Target points to two cases from outside of this circuit in support of its argument: Baugus v. CSX Transportation, Inc., 223 F.R.D. 469 (N.D. Ohio 2004), and Trevelyn Enterprises, LLC v. Seabrook Marine, LLC, 2020 WL 4437236 (E.D. La. Aug. 3, 2020).  ECF No. 31 at 5–6.

In Baugus, the court excluded a video that the plaintiff made on the defendant's property after entering the property without the defendant's permission.  223 F.R.D. at 470.  The plaintiff in that case was a railroad employee who had allegedly been injured while working in the defendant's railyard.  Id.  One night, the plaintiff trespassed upon the defendant's railyard and videoed himself pretending to work on the railcars.  Id.  The court determined that, pursuant to Rule 34(a)(2), the plaintiff should have sought permission from the defendant before entering the railyard and excluded the evidence. Id.  The court noted that part of the purpose of the Rule is to ensure that both sides have the opportunity to attend the inspection to ensure that any record created is accurate.  Id. The court went on to explain that Rule 34 permits a court to examine the conditions of the proposed inspection and balance the need for the inspection against the burdens and dangers created by the inspection.  Id.  Obtaining prior consent or judicial approval, the

court explained, "would have been especially appropriate" when the plaintiffs were entering a rail yard at night and manipulating dangerous equipment.  Id.  Thus, the court determined that the plaintiff should have sought the defendant's permission before entering the railyard and excluded admission of the video as a sanction for the plaintiff's failure to do so.  Id.

Similarly, in Trevelyn, the court determined that an expert acted improperly when he entered a shipyard to photograph and inspect a yacht that was the subject of the lawsuit.  2020 WL 4437236.  The defendant's counsel first requested permission for the expert to photograph the yacht, but the plaintiff's counsel refused.  Id. at *1.  The defendant's counsel threatened to file a motion to compel, but before pursuing that motion, the expert entered the shipyard without permission and inspected and photographed the yacht.  Id. at *2.  Though the shipyard was not owned by either party, the court noted that the expert did not have permission to be there or to enter the yacht's travel lift footprint.  Id. at *4.  The court noted that the plaintiff had indicated it wanted to have a representative at the yacht at the time of the expert's inspection and that the plaintiff was deprived of that opportunity when the expert inspected the yacht without the plaintiff's permission.  Id.  The court explained that the proper course would have been for the defendant to pursue a motion to compel pursuant to Rule 34.  Id.  Because the defendant failed to do so, the court excluded the photos taken by the expert during the unauthorized inspection, prohibited the expert from being called as a witness, and prohibited the photos or measurements taken during the unauthorized inspection from being used in the litigation.  Id.

Target argues that, like the plaintiff in <u>Trevelyn</u>, it was deprived of the opportunity to have a representative present during Dr. Szubski's and Williams's inspections of the endcap, and that the court should sanction this behavior.[2]  ECF No. 31 at 8.  Target maintains that the reasoning in <u>Baugus</u> and <u>Trevelyn</u> is instructive because, although those cases involved an expert trespassing upon private property, the courts based their rulings, in part, on other considerations.  ECF No. 36 at 2–3.  For instance, the court in <u>Baugus</u> explained that requiring parties to seek permission before inspecting property allows each side to be present with counsel and allows the court to determine when such inspections are necessary.  <u>Id.</u> at 3 (citing <u>Baugus,</u> 223 F.R.D. at 470–71).  Similarly, the court in <u>Trevelyn</u> explained that the Rule 34 violation was the fact that the expert had performed the inspection without permission, and this analysis does not change depending on whether the property was public or private.  <u>Id.</u> at 3 (citing <u>Trevelyn</u>, 2020 WL 4437236, at *4).

The court disagrees with Target and will not exclude Dr. Szubski's and Williams's testimony on the basis of their site inspections.  The plain language of Rule 34(a) does not require that a party serve a request on another party before entering land; rather, the Rule merely provides that a party "<u>may</u> serve" such a request on another party.  Fed. R. Civ. P. 34(a) (emphasis added).  The sanctionable violation in both <u>Baugus</u> and <u>Trevelyn</u> was that the respective experts did not have permission to be on the properties and did not seek permission via Rule 34.  <u>See</u> <u>Baugus</u>, 223 F.R.D. at 470–71; <u>Trevelyn</u>, 2020 WL 4437236, at *4.  Other courts have distinguished this sort of situation from

---

[2] Target also notes that Varner's counsel was present during Dr. Szubski's inspection of the endcap.  ECF No. 31 at 8.

situations in which experts fail to make a request under Rule 34 but inspect property from a place where they have permission to be. See Buckner v. Union Pac. R.R. Co., 2024 WL 915498, at *6 (D. Nev. Mar. 4, 2024) (distinguishing Baugus because Rule 34(a)(2) "does not bar a party from standing in a public area and taking photographs of areas of private property that is otherwise in plain view"); Willink v. Boyne USA, Inc., 2013 WL 12141324, *3 (D. Mont. Dec. 20, 2013) (distinguishing Baugus because "while [the place where the inspection took place was] private property, it is open to and widely used by the public during the summer months").[3] Therefore, the court denies the portion of Target's motion to exclude based on Dr. Szubski's and Williams's inspections of the endcap.[4]

### 2. Dr. Szubski's Testimony

Dr. Szubski offers the following opinions in her report:

1.    Pamela Varner tripped, fell, and was injured on the empty endcap of Target located at 7250 Rivers Ave, North Charleston, SC on December 1, 2022.

2.    It is foreseeable and reasonable that people will be walking the Target aisles while shopping for goods.

3.    Ms. Varner did not perceive the presence of the empty endcap in her walking path due to the hazard falling outside of her line of sight, visually blending in with the flooring below, and being obstructed by the goods Ms. Varner was carrying at the time of the incident.

---

[3] The court further noted in Willink that, although the responding party in that case did not have the opportunity to be present when the inspecting party took photographs, the accuracy of the photographs taken during the inspection could be addressed at trial. 2013 WL 12141324, at *4. The same is true in this case.

[4] Although the court will not exclude the inspections in this case, the most common and most proper procedure to inspect pursuant to Rule 34 is to coordinate an expert's inspection with opposing counsel. Varner should not take the court's denial of Target's motion as an indication that it will allow this type of inspection without consultation with the opposing party in the future.

4.       Ms. Varner did nothing unreasonable to contribute to her fall.

5.       Ms. Varner's fall was caused by the defective condition of the empty endcap. Target instructs its employees to ensure that endcaps are stocked in order to prevent trip and falls. Target and its employees were responsible for maintaining a safe retail environment for both its guests and employees.

ECF No. 31-3 at 10. In general, Target argues that these conclusions are not admissible because they would not help the jury. ECF No. 31 at 11–15.

Rule 702 requires that an admissible expert opinion be based upon "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). By negative implication, "Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance." Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986). The Fourth Circuit applies the "common knowledge" rule, which finds expert testimony to be unnecessary when reaching the expert's opinion "is something that can sufficiently be done by the jury without help from an expert." United States v. Dorsey, 45 F.3d 809, 815 (4th Cir. 1995). This rule applies to both an expert's opinion that might help the jury determine the facts of the case and an expert's opinion that might help the jury interpret certain evidence. Minn. Laws. Mut. Ins. Co. v. Batzli, 2010 WL 670109, at *2 (E.D. Va. Feb. 19, 2010) ("Where lay jurors are fully able to understand and appreciate the implications of the evidence admitted, proffered expert testimony will not assist the jury in determining a factual issue[] and is therefore inappropriate.").

The admission of "common sense" expert testimony is dangerous because "the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." Scott, 789 F.2d at 1055. This is especially true with issues that are traditionally resolved by the jury. For example, issues of "foreseeability and

reasonableness . . . are factual issues that lay jurors can independently understand and assess." <u>Minn. Laws.</u>, 2010 WL 670109, at *2; <u>see also</u> <u>Tyree v. Bos. Sci. Corp.</u>, 54 F. Supp. 3d 501, 564 (S.D.W. Va. 2014), as amended (Oct. 29, 2014) ("The reasonableness of conduct and a party's then-existing state of mind 'are the sort of questions that lay jurors have been answering without expert assistance from time immemorial.'") (quoting <u>Kidder v. Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.</u>, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998)).

Varner offers Dr. Szubski as an expert in human factors.  <u>See</u> ECF No. 31-3 at 3. The study of "human factors" is "essentially the study of 'the interrelationship between human behavior or capabilities and the surrounding environment.'"  <u>Hickerson v. Yamaha Motor Corp.</u>, 2016 WL 4123865, at *3 (D.S.C. July 29, 2016) (citing Douglas R. Richmond, <u>Human Factors in Personal Injury Litigation</u>, 46 Ark. L. Rev. 333, 335 (1993)).  Trial courts have a long history of grappling with human factors expert testimony to determine whether such testimony is "based upon scientific, technical or other specialized knowledge" and thus helpful to a jury, or whether such testimony is "within the common knowledge of jurors" and thus unhelpful and inadmissible.  Fed. R. Evid. 702(a); <u>e.g.</u>, <u>Scott</u>, 789 F.2d at 1055.

In <u>Scott</u>, the Fourth Circuit confronted this issue head-on.  789 F.2d at 1053. There, the plaintiff brought a premises liability action against Sears after she stepped on a displaced and partially dilapidated curb in the parking lot, fell, and broke her leg.  <u>Id.</u> Much like in this case, the question of Sears's liability turned on whether the irregularity of the curb was "open and obvious."  <u>Id.</u>  To show that it was not, the plaintiff presented

the testimony of an expert in human factors who offered several opinions, which are relevant to the court's analysis in this matter.  Id. at 1054.

The Fourth Circuit first considered the human factors expert's opinion that the undamaged portion of the curb was higher than the damaged portion and thus likely obscured from the plaintiff's view.  Id. at 1055.  The court found that this opinion was "of scant help to the jury" because the expert merely interpreted photographs and other evidence already before the jury without utilizing specialized knowledge.  Id.

The second opinion the Fourth Circuit considered in Scott was that "persons wearing heels tend to avoid walking on grates."  Id.  This opinion was undoubtedly rooted in scientific knowledge; the expert provided statistical evidence to back up his claim.  See id.  The Fourth Circuit nevertheless found that the testimony was unhelpful to the jury because "the witness was simply repeating what is already common knowledge and common sense."  Id.  In other words, a common-knowledge opinion is not rendered admissible as an expert opinion merely because it is supported by scientific data or other specialized knowledge.

The Fourth Circuit in Scott also considered the expert's opinion that the curb's yellow paint "might prompt the human eye to fill in discontinuities," such that the plaintiff could not discern the curb's irregularities.  Id.  According to the Fourth Circuit, this was "a paradigm of admissible human factors testimony" because it was a "statement of scientific understanding of the effect of color upon the human perception" and thus not within the general knowledge of the jury.  Id.

Based on these principals, the court finds that Dr. Szubski's testimony should not be excluded entirely but must be limited.  Dr. Szubski's first, fourth, and fifth opinions

are unhelpful because they are merely Dr. Szubski's interpretations of other evidence in the record. See Scott, 789 F.22 at 1055. Likewise, Dr. Szubski's second opinion is unhelpful because it is based on what is reasonable or foreseeable, which is a question for the jury. See Minn. Laws., 2010 WL 670109, at *2.

Finally, Dr. Szubski's third opinion is unhelpful as currently written because Dr. Szubski proposes to testify about what Varner perceived at the time of her fall. The jury can gain this information by listening to Varner's own testimony. However, elsewhere in Dr. Szubski's report, she describes how the color of the endcap would have made it difficult to perceive based on how people process visual information. ECF No. 31-1 at 8–9. This is very similar to the opinion on human perception that the Fourth Circuit described as "a paradigm of admissible human factors testimony" in Scott. See 789 F.2d at 1055. Therefore, provided that the foundation has already been laid as to what Varner perceived, Dr. Szubski may offer her third conclusion for the limited purpose of explaining how the color of the endcap might have impacted Varner's ability to perceive it. All of Dr. Szubski's other opinions are excluded.

### 3. Williams's Testimony

In his report, Williams offers the following opinions:

7.1 The empty protruding corner of the endcap display base in a customer aisle was dangerous in a manner that caused Varner's fall and injury.

7.2 The empty protruding corner of the endcap display base was dangerous because it posed a tripping hazard in a foreseeable pedestrian path that violated nationally recognized standards for safe walkways in a retail environment.

7.3 It was foreseeable that shoppers entering Target would follow Varner's path of travel into the store toward the grocery aisles, and not notice the hazardous empty protruding corner of the endcap display base.

14

> 7.4    Target should have known that reasonably attentive shoppers walking in close proximity to the empty protruding corner of the endcap display base would be focused on merchandise and not be looking at the floor.
>
> 7.5    The failure of Target to maintain adequate stocking of product at the endcap display violated the standard of care for retail facilities, and created the dangerous condition that caused Varner to trip and fall.

ECF No. 31-5 at 8. Target argues that the court should exclude Williams's testimony for three reasons. First, Target argues that many of Williams's opinions are human factors opinions. ECF No. 31 at 8–11. Second, Target argues that, like Dr. Szubski's opinions, Williams's opinions should be excluded because they will not help the jury. Id. at 11–15. Finally, Target argues that Williams's opinions regarding national standards of care should be excluded because Williams has failed to articulate what those standards of care are. ECF Nos. 36 at 5; 41; 45.

### a. Human Factor Opinions

Target argues that Williams testimony on human factors should be excluded for two reasons. First, Target argues Varner already has a human factors expert, Dr. Szubski, and Williams's testimony is therefore duplicative of Dr. Szubski's testimony. ECF No. 31 at 8–10. In making this argument, Target notes the similarities in Williams's and Dr. Szubski's conclusions as well as the fact that both witnesses relied on the same article from The Journal of Human Factors and Ergonomics Society in crafting their testimony. Id. Second, Target argues that Williams is not qualified to testify about human factors. Id. at 10–11; ECF No. 36 at 3–4.

In response, Varner emphasizes that Williams is being offered as an expert in architecture but concedes that some of his testimony may overlap with human factors. ECF No. 34 at 5–6. Varner argues that the fields overlap because the field of human

15

factors concerns how humans interact with buildings and environments after they are designed. <u>Id.</u> at 5. To the extent Williams's testimony overlaps with human factors, Varner argues that he should be permitted to offer these conclusions because Williams has previously been permitted to testify on facility safety, and Varner argues that Williams's testimony in this case similarly concerns facility safety. <u>Id.</u> at 6–7. Notably, Varner does not argue that Williams is qualified to testify on human factors.

The court agrees with Target that Williams's third and fourth conclusions have more to do with "the interrelationship between human behavior or capabilities and the surrounding environment" than facility design and safety. <u>Hickerson</u>, 2016 WL 4123865, at *3. Therefore, the court finds that these two conclusions are human factors opinions, which is beyond Williams's architectural expertise. <u>See</u> ECF No. 31-5 at 1 (explaining Williams's qualifications to testify on architecture). These two conclusions are accordingly excluded.

Williams's other conclusions are a closer call. In particular, the court notes the overlap in his second conclusion with foreseeability of human behavior and facility design. <u>See</u> ECF No. 31-5 at 8. Nevertheless, the court finds that Williams's first, second, and fifth conclusions are primarily focused on facility design and are therefore within Williams's area of expertise.

### b. Helpfulness to the Jury

Target argues that the court should exclude Williams's testimony because it will not be helpful for the jury. ECF No. 31 at 11–15. In response, Varner argues that Williams's testimony should be admitted because he will testify on national design industry standards related to facility safety. ECF No. 34 at 10. Varner contends that this

is specialized knowledge that will help the jurors understanding the applicable standard of care.  Id.

The court agrees with Varner that Williams's testimony could be helpful if he is able to testify on the applicable standard of care in the industry, which is specialized knowledge beyond the general knowledge of the average juror.  Indeed, Williams touches on such national standards in his second and fifth conclusions.  See ECF No. 31-5 at 8. That said, Williams also touches on the issue of foreseeability in this same conclusion, id., and, to reiterate, foreseeability is typically a question that should be left for the jury, see Tyree, 54 F. Supp. 3d at 564.  As such, the court excludes Williams's first, second, and fifth conclusions to the extent they touch on foreseeable consumer behavior in a retail environment.  However, to the extent his testimony is based on national standards for design and facility safety, the court finds that these opinions could be helpful.  The court will address whether these opinions are excluded in the next section of this order.

### c.  National Safety Standards

In its reply, Target briefly argues for the first time that, despite offering opinions in his report that Target's empty endcap was contrary to national design safety standards and practices of other retailers, Williams was unable to point to any specific design standards or practices of other retailers.  ECF No. 36 at 5.  Target therefore argues that Williams's second and fifth conclusions on national safety standards must be excluded. Id.

The court will start by analyzing whether Williams articulated a national safety standard in support of his second conclusion.  To reiterate, Williams concluded:

> 7.2     The empty protruding corner of the endcap display base was
>         dangerous because it posed a tripping hazard in a foreseeable

> pedestrian path that violated nationally recognized standards for safe
> walkways in a retail environment.

ECF No. 31-5 at 8.

In his report, Williams specifically explained that the endcap violated national safety standards because it is only 7.5 inches tall and because it matches the color of the surrounding floor. ECF No. 31-5 at 2. Williams cited to the National Safety Council's Accident Prevention Manual, which he claimed establishes a nationally recognized safety standard that the color of display platforms should contrast with the surrounding floor and that floor displays should be at least three feet tall to be visible. ECF No. 31-5 at 6.

Further, during Williams's deposition, Target noted that there is a red strip on the floor surrounding the endcap. Williams Depo. 115:9–12. Williams responded by stating that the national standard is for yellow, rather than red, to be used for marking tripping hazards. Id. at 116:18–119:1. Williams explained that he based this opinion on the American National Standards Institute's ("ANSI") National Safety Color Code, and he offered to send Target's counsel a copy of that publication.[5] Id.

Moreover, Williams also stated in his report that Target did not follow other safety practices followed by similar retailers. ECF No. 31-5 at 8. In his deposition, he specifically testified that he had previously worked on cases involving Lowe's, Walmart, Tractor Supply, and Home Depot, but he was not sure if he would be able to provide information on those retailers because of protective orders. Williams Depo. 172:24–173:5.

---

[5] Evidently, Williams did not immediately do so, and at the hearing, the court ordered that Williams produce the standard. See ECF No. 38.

After the court's hearing, Williams followed up by producing ANSI's National

Safety Color Code for Target, but as he predicted, he was not able to provide any

additional information on the practices and procedures followed by the other retailers.

See ECF Nos. 39 at 5–7; 41 at 4–5.  Varner argues that Williams appropriately identified

the requisite standards of care by (1) citing to the National Safety Council's Accident

Prevention Manual and (2) producing the ANSI Color Safety Code.[6]  See ECF No. 41 at

4–5.  However, Target asserts that Williams only provided a three-page snippet of the

Accident Prevention Manual and that this snippet refers to floor displays that are not

permanent and that this document is not applicable to aisle endcaps.  ECF No. 45 at 2–3

(citing ECF No. 45-2).

In reviewing this very short snippet, the court cannot tell if the Accident

Prevention Manual is applicable to endcaps or not.[7]  See ECF No. 45-2.  Thus, while the

court finds that the Accident Prevention Manual does describe a safety standard, the court

finds that Varner has not carried her burden of providing that this standard is relevant to

the facts of this case.  See Sardis, 10 F.4th at 288–90 (finding that an expert's opinion on

---

[6] Target also argues that Williams's conclusion is supported by a peer-reviewed study completed by Dov Zohar in 1978.  ECF No. 41 at 4.  However, rather than citing to this study, Varner cites to Williams's description of this study in his deposition.  See id. The court therefore has not seen this study, but the court notes that Williams's description of this study indicates that it is focused on human perception and how people expect retail environments to be laid out.  Williams Depo. 127:13–25.  The court therefore finds that Varner has not shown that the Zohar study supports Williams's contentions regarding national standards of care because the study seems to be more focused on human factors than facility design.

[7] The court notes that the portion of the Accident Prevention Manual that Williams provided refers to "[f]loor displays" and notes that these displays "should not be at the ends of aisles where shopping carts can dislodge them."  ECF No. 45-2 at 3. Therefore, even though the court has not seen the rest of the manual, the court highly doubts that it is applicable to endcaps that are permanently affixed to the ends of aisles.

the applicable standard in a products liability case was not relevant when his testimony

failed to establish that the standard governed the product at issue in the case).  Therefore,

the court excludes Williams's testimony that the endcap violated standards articulated in

the Accident Prevention Manual.

Target next argues that the court should exclude Williams's opinion on the color

of the strip surrounding the endcap.  ECF No.  39 at 5.  Target argues that Williams has

not pointed to a particular section of the code that Target allegedly violated.  ECF No. 39

at 5–6.  Target also asserts, for the first time in its reply to Varner's supplemental

briefing, that ANSI's Safety Color Code does not actually establish a national standard

and is instead more aspirational on what ANSI hopes retailers should do.  ECF No. 45 at

1–2.

While the Safety Color Code specifically says it is not intended to replace existing

standards in certain specific industries, it also states that "[t]he intent of this standard is to

establish a safety color code that will alert and inform persons to take precautionary

action or other appropriate action in the presence of hazards."  ECF No. 45-1 at 5–6

(emphasis added).  It later goes on to explain that red is commonly the color to denote

flammable liquids or fire hazards and that yellow is commonly used to mark "physical

hazards which might result in: striking against, stumbling, falling, tripping, or being

caught in-between."  Id. at 9.  The court therefore finds that the Safety Color Code

establishes that yellow is the color typically used to mark tripping hazards, which aligns

with Williams's deposition testimony.  See id.; Williams Depo. 116:21–25.  Williams is

therefore permitted to testify that yellow is the color that typically marks tripping

hazards.

Finally, Varner argues that, even though Williams was not able to discuss safety practices followed by other retailers, he should still be permitted to compare Target's practices with those followed by other retailers in his testimony.  ECF No. 41 at 5.  However, she provides no citation or reasoning for this assertion.  See id.  The court therefore excludes Williams's testimony on safety practices followed by other retailers.

The court now turns to Williams's fifth opinion.  To reiterate, Williams concluded:

> 7.5     The failure of Target to maintain adequate stocking of product at the endcap display violated the standard of care for retail facilities, and created the dangerous condition that caused Varner to trip and fall.

ECF No. 31-5 at 8.  Williams does not provide any citation for his conclusion that failing to stock an endcap violated a national safety standard.  Instead, Williams appears to base this conclusion entirely on the fact that Target allegedly violated its own policy when it failed to stock the endcap.[8]  See ECF No. 31-5 at 6–7.  Consequently, Williams has not articulated a national standard of care for retail facilities that Target allegedly violated when it failed to maintain stock on the endcap.  Moreover, the jury can interpret Target's policies without Williams's commentary.  Because Williams's fifth opinion appears to be based exclusively on Target's alleged violation of its own policy, Williams's testimony

---

[8] Though unclear, it is possible that Williams also bases this conclusion on a 1973 safety guidebook that instructs retailers to "[a]rrange for periodic inspections, which will act as a control in pinpointing hazardous conditions and unsafe practices."  ECF No. 31-5 at 7 (quoting George J. Matwes & Helen Matwes, Loss Control: A Safety Guidebook for Trades and Services (New York, NY: Van Nostrand Reinhold Co. 1973)).  To the extent Williams bases his conclusion on this source, the court finds that directing employees to make regular inspections is not a safety standard related to facility design—if anything, it is a standard related to managing a retail store.  In any event, Varner offers Williams as an expert in facility design, not management.  See ECF No. 31-5at 1.  Therefore, Varner has not demonstrated that Williams is qualified to offer this opinion.

will not be helpful to the jury.  See Scott, 789 F.2d at 1055.  This opinion is therefore excluded.

In sum, the court excludes Williams's third, fourth, and fifth opinions.  He is permitted to testify on his first and second opinions.  However, his testimony must be limited to whether Target violated national safety standards based on Target's failure to use the color yellow to mark a tripping hazard.[9]  The remainder of Williams's testimony is excluded.

### B.  Motion for Summary Judgment

Target moves for summary judgment on Varner's sole count of negligence and, alternatively, moves for summary judgment on the question of punitive damages.  ECF No. 32.  The court will start with Target's arguments on negligence.

#### 1.  Negligence

Target contends that it is entitled to summary judgment on Varner's negligence claim.  First, Target argues that Varner cannot prove that the endcap was in a dangerous condition.  ECF No. 32 at 3–5.  Second, even if the endcap was in a dangerous condition, Target argues that the danger was open and obvious.  Id. at 5–7.  Moreover, Target contends that, even though the danger was open and obvious, Target had no reason to anticipate Varner's harm and therefore had no duty to warn Varner of the alleged danger. Id. at 7–8.

---

[9] To be clear, the court reads Williams's first conclusion as a summary of his other conclusions.  See ECF No. 31-5 at 8.  Therefore, even though the court is permitting Williams to testify on his first conclusion, his testimony is subject to the same restrictions that the court is placing on Williams's second conclusion—in other words, Williams is permitted to offer his first conclusion, but this testimony may not go beyond Target's failure to use the color yellow to mark a tripping hazard.

To prevail on a negligence claim in South Carolina, a plaintiff must establish that (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached the duty; (3) the breach was an actual or proximate cause of the plaintiff's injury; and (4) the breach resulted in injury to the plaintiff. Madison v. Babcock Ctr., Inc., 638 S.E.2d 650, 656 (S.C. 2006). "Whether the law recognizes a particular duty is an issue of law to be determined by the court." Jackson v. Swordfish Inv., L.L.C., 620 S.E.2d 54, 56 (S.C. 2005).

Under South Carolina law, "[a] merchant is not an insurer of the safety of his customers but owes only the duty of exercising ordinary care to keep the premises in reasonably safe condition." Garvin v. Bi–Lo, Inc., 541 S.E.2d 831, 832 (S.C. 2001). "One who operates a mercantile establishment . . . must keep the aisles and passageways in a reasonably safe condition." Moore v. Levitre, 365 S.E.2d 730, 730 (S.C. 1988). "To recover damages for injuries caused by a dangerous or defective condition on a defendant's premises, a plaintiff 'must show either (1) that the injury was caused by a specific act of the respondent which created the dangerous condition; or (2) that the respondent had actual or constructive knowledge of the dangerous condition and failed to remedy it.'" Pringle v. SLR, Inc., of Summerton, 675 S.E.2d 783, 787 (S.C. Ct. App. 2009) (quoting Anderson v. Racetrac Petro., Inc., 371 S.E.2d 530, 531 (S.C. 1988)). When the business owner or its agents "created the condition at issue, the key question is whether [the customer] presented sufficient evidence to create an issue of fact as to whether this condition was indeed hazardous." Shain v. Leiserv, Inc., 493 S.E.2d 111, 112 (S.C. Ct. App. 1997).

### a. Dangerous or Hazardous Condition

Target first argues that Varner cannot prove the endcap was a dangerous condition.  ECF No. 32 at 3–5.  Target notes that Varner has not alleged that endcaps are inherently dangerous, and, instead, her allegation is that the endcap was in a dangerous condition because it did not contain merchandise.  Id. at 4.  Target asserts that Varner's only evidence that the lack of merchandise made the endcaps dangerous is Williams's and Dr. Szubski's testimony and Target's internal "Slip, Trip, & Fall Prevention" policy (the "Policy"), which states that endcaps should not be left empty.  Id. at 4–5.  However, as explained above, Target argues that Williams's and Dr. Szubski's testimony is inadmissible.  Id. at 4.  Likewise, Target argues that the Policy cannot be used to establish Target breached its duty of care because Target's 30(b)(6) designee, Jade Eberhart ("Eberhart"), testified that (1) the Policy only identifies empty endcaps as "potential hazard[s]," and (2) the subject endcap was not in the same condition as the empty endcap pictured in the Policy.  ECF No. 32 at 5 (emphasis and internal quotation marks omitted) (quoting ECF No. 32-4, Eberhart Depo. 25:23–24).

A reasonable jury could find that the empty endcap was a dangerous condition, and the court denies Target's motion for summary judgment accordingly.  First, for reasons previously explained, the court will permit Williams to testify on Target's failure to use the color yellow to mark a tripping hazard and will permit Dr. Szubski to testify that someone may have a hard time seeing the endcap.  A reasonable jury could find that Target created a dangerous condition from this testimony.

Second, a reasonable jury could also find that Target failed to exercise reasonable care from the fact that Target violated its own internal Policy regarding empty endcaps.

See <u>Caldwell v. K-Mart Corp.</u>, 410 S.E.2d 21, 24 (S.C. Ct. App. 1991) ("In negligence cases, internal policies or self-imposed rules are often admissible as relevant on the issue of failure to exercise due care."). Target's Policy states: "Immediately taking care of potential hazards eliminates the risk of injury to our team or guest." ECF No. 32-2 at 1. It then lists examples that are "[u]nsafe," such as when "[e]ndcaps are left empty." <u>Id.</u> The Policy includes a picture of an empty endcap. <u>Id.</u> As Target points out, the pictured endcap differs from the subject endcap that Varner allegedly tripped over in a number of ways. For instance, there is a red stripe on the floor next to the subject endcap and no stripe on the floor next to the endcap pictured in the Policy. <u>Compare</u> <u>id.</u> <u>with</u> ECF No. 32-3 (pictures of the subject endcap). Eberhart also testified that the subject endcap has a black base, unlike the endcap pictured in the photo, and suggested that the subject endcap is a different size than that in the photo. Eberhart Depo. 23:2–14. While the subject endcap does, in some ways, differ from that pictured in the Policy, a reasonable jury could find that those differences are not material; <u>i.e.</u>, a reasonable jury might find that the empty endcap violated the Policy despite the fact the endcap differed in some ways from that pictured in the Policy. As such, a reasonable jury could find that the endcap was in an unsafe condition, or as the Policy describes it a "potential hazard[]." ECF No. 32-2.

### b. Open and Obvious

Target next argues that, even if the endcap was a dangerous condition, the court should grant summary judgment because the danger was open and obvious and Target had no reason to anticipate Varner's harm. ECF No. 32 at 5–8.

"Under South Carolina law, the owner of property owes no duty to use reasonable care to take precautions against or to warn guests of open and obvious dangers.  In such situations, the guests themselves have a duty to discover and avoid the danger."  Green v. United States, 105 F. App'x 515, 516 (4th Cir. 2004) (unpublished) (citing Neil v. Byrum, 343 S.E.2d 615, 616 (S.C. 1986)).  "The entire basis of an invitor's liability rests upon his superior knowledge of the danger that causes the invitee's injuries.  If that superior knowledge is lacking, as when the danger is obvious, the invitor cannot be held liable."  H.P. Larimore v. Carolina Power & Light, 531 S.E.2d 535, 538 (S.C. Ct. App. 2000).

However, "the open and obvious danger rule has an exception, where the premises owner should reasonably anticipate that invitees may be distracted or will not discover the danger."  Hackworth v. United States, 366 F. Supp. 2d 326, 330 (D.S.C. 2005).  Thus, "an owner may be required to warn the invitee, or take other reasonable steps to protect him, if the 'possessor has reason to expect that the invitee's attention may be distracted, so that he will not discovery what is obvious, . . . or fail to protect himself against it."  Callander v. Charleston Doughnut Corp., 406 S.E.2d 361, 362–63 (S.C. 1991) (quoting Restatement (Second) Torts § 343A, cmt. (f) at 220–21 (1965)).

Target points out that Varner testified, in her deposition, that she shops at the subject Store frequently and that she is aware of the fact that each aisle has an endcap.  ECF No. 32 at 6–7 (citing ECF No. 32-1 at 31:14–16, 32:15–21, 53:12–19).  Target also notes that the endcap is large and that there was nothing obscuring it from Varner's view.  Id. at 7.  Therefore, Target argues that the empty endcap was open and obvious to Varner.  Id. at 6–7.  Moreover, Target also argues that it had no reason to anticipate harm despite

26

the obviousness of the defect.  Id. at 7–8.  Target notes that there was only one other incident that had occurred in the eight months preceding Varner's fall involving a customer tripping over an endcap, and it does not appear that the endcap was empty in that incident.  Id.  In response, Varner argues that a reasonable jury could find that the endcap was not open and obvious or that Target should have anticipated the harm.  ECF No. 33 at 6–9.

The court observes that an empty endcap could be seen to be open and obvious but that a reasonable jury might find that Target should have known or reasonably foreseen that a customer might be distracted and fall.  See Callander, 406 S.E.2d at 362–63.  Target's Policy states that empty endcaps can be a potential hazard, ECF No. 32-2, and Eberhart testified in her deposition that Target was aware the endcap was empty prior to Varner's alleged fall, Eberhart Depo. 16:9–17.  From this, a reasonable jury could find that Target was aware that the endcap might cause an injury despite the fact that it was open and obvious.  As such, the court denies Target's motion for summary judgment on Varner's claim for negligence.[10]

### 2.  Punitive Damages

Target argues that, if the court does not grant summary judgment in its favor on Varner's negligence claim, it should grant summary judgment in her favor on punitive damages.  ECF No. 32 at 8–9.

---

[10] Target also argues, for the first time in reply, that the court should grant summary judgment on Varner's negligence claim because she has not produced evidence to prove causation.  ECF No. 35 at 5.  The court does not reach this issue because it was raised for the first time in reply.  See United States v. Williams, 445 F.3d 724, 736 n.6 (4th Cir. 2006).

Punitive damages are available when "the defendant's conduct was so reckless, willful, wanton, or malicious that the defendant should be punished and deterred by requiring him or her to pay money to the plaintiff." Clark v. Cantrell, 529 S.E.2d 528, 534 (S.C. 2000). "[T]he difference between mere negligence and conduct of higher culpability that would justify a punitive damages award is a matter of degree, [and] a defendant's conduct may rise to the necessary culpability level for punitive damages if the defendant is consciously or knowingly negligent or the defendant should have known of its negligence." Fox v. Walmart, Inc., 2022 WL 772734, at *2 (D.S.C. Mar. 14, 2022). "If a person of ordinary reason and prudence would have been conscious of the probability of resulting injury, the law says the person is reckless or willful and wanton, all of which have the same meaning—the conscious failure to exercise due care." Berberich v. Jack, 709 S.E.2d 607, 612 (S.C. 2011). Put another way, "if the record is sufficient for a jury to find that [Target] knew or should have known of a hazardous condition that the 'person of ordinary reason and prudence' would have remedied, [Target's] Motion must be denied." Fox, 2022 WL 772734, at *2 (quoting Berberich, 709 S.E.2d at 612). "In any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence." S.C. Code Ann. § 15–33–135.

Target contends that there is insufficient evidence from which a reasonable jury could find that Target's actions amounted to reckless, willful, wanton, or malicious conduct, and that the court should grant summary judgment on punitive damages accordingly. ECF No. 32 at 9. In response, Varner argues that a jury could find that Target was aware of a danger and did not take steps to minimize it, such that punitive

28

damages might be appropriate.  ECF No. 22 at 9–11.  In reply, Target argues that South Carolina law requires Varner proving that Target deliberately intended to injure her and that she has failed to do so.  ECF No. 35 at 5–6.

The court agrees with Varner that a jury could award punitive damages if the jury finds that Target "knew or should have known of a hazardous condition that the 'person of ordinary reason and prudence' would have remedied."  Fox, 2022 WL 772734, at *2 (quoting Berberich, 709 S.E.2d at 612).  A jury could reach this determination based on the evidence in the record regarding Target's Policy on empty endcaps, ECF No. 32-2, and Eberhart's testimony that Target was aware the endcap was empty prior to Varner's alleged fall, Eberhart Depo. 16:9–17.  For this reason, the court denies Target's motion for summary judgment on punitive damages.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART AND DENIES IN PART** Target's motion to exclude and **DENIES** Target's motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**February 12, 2025**
**Charleston, South Carolina**

29